Filed 2/25/13  P. v. Moore CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B234798 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. BA307447) |
| DAVID G. MOORE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Larry P. Fidler, Judge.  Affirmed.

Law Offices of Allen G. Weinberg and Derek K. Kowata, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Viet H. Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant David G. Moore of two counts of first degree murder (Pen. Code, § 187, subd. (a)).[1] In both counts, it found true additional allegations of firearm use (§ 12022.53, subds. (b), (c), and (d)) and two special circumstance allegations: multiple murder and gang murder (§§ 190.2, subds. (a)(3) and (a)(22)). Also, the jury convicted him of possession of a firearm by a felon (§ 12021, subd. (a)), and found the gang enhancement allegation true in all counts (§ 186.22, subd. (b)(1)). The trial court sentenced him to two consecutive terms of life in prison without the possibility of parole, plus a consecutive determinate term of seven years. He appeals from the judgment of conviction, contending that the evidence is insufficient to support the gang murder special circumstance allegation and the gang enhancement allegation, and that the trial court erred in not staying the sentence for possession of a firearm by a felon pursuant to section 654. We disagree with both contentions and affirm the judgment.

## BACKGROUND

Because the claims on appeal do not contest the sufficiency of the evidence to support the convictions, we only briefly summarize the evidence at trial, and in connection with our discussion of the appellate contentions will review additional evidence as necessary.

On the evening of July 9, 2001, defendant shot and killed Frederick Pettaway (Frederick) and Willie Williams (Williams) in front of a house on South Gramercy Place in Los Angeles. According to Rogers Pettaway (Rogers), who lived at the Gramercy house and was the brother of victim Frederick Pettaway, defendant and Frederick ran a bank robbing crew. Defendant was in charge, but he

---

[1]     All undesignated section references are to the Penal Code.

and Frederick had many clashes over control. They used a "sucker crew" of younger accomplices who would commit the robberies and deliver the proceeds to them, in exchange for a fee of $1,500 or less. Defendant and Frederick split partners' shares of the proceeds. Victim Willie Williams, a childhood friend of Frederick's, began as a member of the sucker crew, but worked his way up to become one of the leaders with defendant and Frederick. All told, the crew robbed six to eight banks and made approximately $400,000.

In addition to running the bank robbery crew, defendant was a member of the Van Ness Gangsters (VNG), a Bloods affiliated gang of about 60 to 80 members, which claimed the area in which the Gramercy house was located. Defendant was an "original gangster", or "O.G.", and thus a shot caller who managed gang activities. Some members of the sucker crew were VNG members. Neither Frederick nor Williams were VNG members.

On the day of the shooting, Rogers was in the yard at the Gramercy house with, among others, defendant, Frederick, and Williams. They were discussing using some of the bank robbery proceeds to pay for the funeral of Tamille Cooper (Rogers' step daughter) who had been killed by a Crips gang member in a drive-by shooting two days earlier. Frederick wanted to use the proceeds, but defendant did not. Frederick said that he would "just do it by [himself]" and would "take some of the money out and do it like that." After additional argument, Frederick and defendant agreed to discuss the matter at a later time. They then began smoking "Sherm" and acting "crazy, stupid." At some point, defendant removed his shirt and Rogers observed that he had a gun in his waistband (he always carried two guns, a nine-millimeter semiautomatic pistol and a .45 automatic).

Defendant, Frederick, and Williams left to buy alcohol, and returned about an hour later. Everything seemed calm. Later in the afternoon, a barbecue was held across the street. Frederick and Williams attended around 6:00 p.m.

3

Theadora Smith, a VNG member who had known defendant for 13 years, was across the street from the barbecue smoking Sherm. She saw Frederick and Williams walk up to defendant. Williams tried to talk to defendant, but defendant said he did not want to hear it and repeatedly told Frederick to get Williams away from him. Then defendant started shooting. Frederick and Williams fell to the ground.[2]

Jonathan Hunter, a VNG member, was present at the barbecue.[3] He observed defendant pull out a semiautomatic pistol and grab Williams by the neck. When defendant pointed the gun at Hunter, Hunter backed away slowly, then ran to his Camaro. He drove to his grandmother's house where he retrieved an AK-47 and returned to the barbecue. He saw defendant holding Williams and begin shooting. Frederick was trying to talk to defendant, at which point defendant began shooting Frederick. Hoping to make defendant leave, Hunter fired his AK-47 into the air.

John Henry Mitchell was sitting in his truck outside the barbecue. He saw defendant shoot two men outside and then walk down 52nd street.

After the shooting, Rogers saw defendant, holding a black steel handgun, get into the passenger side of a brown Dodge and drive down 52nd Street. Rogers ran across the street and found Frederick lying on the grass. Williams was lying on his back on the driveway. Rogers asked who did it. Williams said, "Man, you know who did it. The same people we've been with all day. . . . Why did they do it?"

---

[2]      Smith gave this version of events in a written statement to Los Angeles Police Detective Grace Garcia in 2006 while in prison. At trial she testified that she wrote what the police wanted her to say.

[3]      At the time of his testimony, Hunter was in federal prison for bank robbery. In exchange for his testimony, the prosecution agreed to inform federal prosecutors that he had cooperated in an effort to reduce his sentence.

Frederick died at the scene.  Williams was transported to the hospital, where he later died.  The cause of death for both was multiple gunshot wounds.

## DISCUSSION

### I.      Gang Allegations

As to both murders, the jury found true the gang murder special circumstance (§ 190.2, subd. (a)(22)), which requires that the defendant "intentionally killed the victim while the defendant was an active participant in a criminal street gang . . . *and the murder was carried out to further the activities of the criminal street gang*."  (Italics added.)  As to the murders and the possession of a firearm by a felon, the jury also found true the gang enhancement allegation (§ 186.22, subd. (b)(1)), which requires that the underlying felony was "committed for the benefit of, at the direction of, or in association with any criminal street gang, *with the specific intent to promote, further, or assist in any criminal conduct by gang members*."  (Italics added.)

Defendant contends that the evidence was insufficient to support the jury's findings on these allegations, because the evidence showed that the killings were based on a personal motive (a dispute over leadership of the bank robbery crew) and not to further the activities of the VNG gang (§ 190.2, subd. (a)(22)) or to promote criminal conduct by the gang (§ 186.22, subd. (b)(1)).  We disagree.  Of course, we view the evidence in the light most favorable to the judgment.  (*People v. Earp* (1999) 20 Cal.4th 826, 887-888.)

It is true that the evidence suggested that defendant settled his rivalry with Frederick Pettaway for control of the bank robbery crew by killing him and Willie Williams.  But as the prosecutor argued, the evidence also supported a second motive:  "the sheer intimidation, reputation-enhancing factor of gang violence"

5

aimed at elevating defendant's status and that of his gang so as to promote and further the gang's criminal activities.

Los Angeles Police Officer Angel Sambrano, whose assignment during his time as a gang officer from 2002 to 2007 included gathering intelligence on the VNG gang, testified as the prosecution gang expert. As an "original gangster," or "O.G." in the VNG gang, which had about 60 to 80 members, defendant was "in the upper echelon [of the gang.] He [was] the shot caller." As a Blood gang, the VNG gang was vastly outnumbered in membership by the Crips gangs. The primary activities of the VNG gang included murders of rival gang members, assaults with deadly weapons, robberies, burglaries, and narcotic sales, by which the gang established respect through fear and intimidation.

Officer Sambrano was asked a hypothetical question in which he was to assume, based on the evidence in the present case, that: (1) a leader in the VNG gang also led a bank robbery crew that had both VNG and non-VNG members; (2) the leader was involved in a rivalry with a non-member of VNG who belonged to the bank robbery crew; (3) at a memorial barbecue for a friend where many other VNG members were present, the leader dragged the nonmember of VNG by the neck across the street and fired multiple shots, hitting the nonmember and another person; and (4) the leader made no effort to conceal his identity.

Based on these assumed facts, Officer Sambrano expressed the opinion that the shooting and the possession of a firearm were committed in association with and for the benefit of the VNG gang. The killing of a robbery crew member by the leader of the crew, also a leader in the VNG, created respect in the gang for the leader and generated fear of the gang in the community, because the leader "had the guts to kill someone in front of everyone [at a VNG gathering] and not really care." Also, "rival gangs now know that someone in [the VNG gang] means all business and is not afraid to kill another human being." Moreover, because the

6

leader was a shot caller in the VNG and thus directs gang activity, the shooting can be considered to have been committed at the direction of the VNG, with the intent of assisting the gang in criminal activity: it was aimed at laying down the rules of the gang and enforcing discipline (some members of the crew were also VNG members), and also protected VNG territory in that rival gangs would know the VNG gang can commit shootings on their turf and get away with it. By the same rational, the shooting furthered the activities of the VNG gang.

As defendant concedes, the California Supreme Court has found expert testimony sufficient to support the gang enhancement allegation: "Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang' within the meaning of section 186.22(b)(1)." (*People v. Albillar* (2010) 51 Cal.4th 47, 63.) Here, we find the testimony of Officer Sambrano sufficient for the jury to infer that defendant sought not simply to resolve his rivalry with Frederick Pettaway over control of the bank robbery crew, but to do so in an openly violent way, in the presence of other VNG members and non-members, with the intent to further the activities of the VNG gang (§ 190.2, subd. (a)(22)) and promote criminal conduct by the gang (§ 186.22, subd. (b)(1)).

Defendant contends that other than his gang membership, there was no connection between the gang and his crimes whatsoever, and that Officer Sambrano's testimony is rank speculation. However, it is not unreasonable to infer that defendant, a shot caller in the VNG, intended to enhance his reputation and that of his gang by brazenly killing two members of his bank robbery crew in front of fellow VNG members and other persons, thereby demonstrating his viciousness and that of the VNG gang. In doing so, he promoted and furthered the criminal activity of his gang.

7

## II. Section 654

Defendant contends that his possession of a firearm was incidental to his commission of the murders, and that therefore the trial court erred under section 654 in sentencing him for the possession of the firearm. However, the evidence was sufficient for the trial court to conclude that the possession of the firearm "was antecedent to and separate from the primary offense" of murder, and committed with a separate intent. (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1147.) Rogers Pettaway testified that hours before the killings he saw defendant remove his shirt, revealing a handgun in his waistband. This occurred long before the confrontation with Frederick and Williams at the barbecue that resulted in the killings. Further, according to Rogers, defendant always carried two guns, a nine-millimeter semiautomatic pistol and a .45 automatic. Thus, the trial court could reasonably conclude that defendant's illegal possession of a firearm was complete long before the shooting, and that defendant had a different intent and objective in possessing the firearm than his intent in the murders. Hence, the trial court did not err under section 654 in sentencing defendant for that possession. (*Jones, supra,* 103 Cal.App.4th at pp. 1147-1148.)

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.


We concur:


EPSTEIN, P. J.


SUZUKAWA, J.

9